# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

records and information associated with the cellular telephone assigned call number 920-382-0457, ("the Account"), and the location of the Account, that are stored at premises controlled by US Cellular ("the Provider"), headquartered at 8410 W. Bryn Mawr, in Chicago, Illinois, 60631.

)
)
)
)
)
)
)

Case No. 19-M-1321

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 2113(a) and (d).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI TFO/DA's Office Investigator Matthew Gibson
*Printed Name and Title*

Sworn to before me and signed in my presence:
Date: 10/1/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Gibson, being first duly sworn on oath, on information and belief state:

## I. INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE:

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 920-382-0457 ("the SUBJECT PHONE") that is stored at premises controlled by US Cellular, a wireless telephone service provider headquartered at 8410 W. Bryn Mawr, in Chicago, Illinois, 60631. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require US Cellular to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have over 28 years of experience as a law enforcement officer and am currently assigned to the Milwaukee FBI Violent Crime Task Force as a Deputized Federal Task Force Officer. I was a Special Agent with the Federal Bureau of Investigation for over 23 years and have been an Investigator with the Milwaukee County District Attorney's Office since 2015. I have participated in numerous complex narcotics, money laundering, violent crime, armed bank robbery, and armed commercial robbery investigations in violation of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 924(c), 1951, 1956, 1957, 2113, 2119, and other related offenses. I have employed a wide variety of investigative techniques in these and other investigations, including but not limited to, the use of informants, wiretaps, cooperating defendants, recorded communications, search warrants, surveillance,

interrogations, public records, DNA collection, and traffic stops. I have also received formal training regarding the same. As a Federal Task Force Officer, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. Based on the facts set forth in this affidavit, there is probable cause that Justin S. Smith and William D. Balgie were involved in three armed bank robberies in southeastern Wisconsin on April 8, 2019, June 17, 2019, and August 9, 2019, in violation of Title 18, United States Code, Sections 2113(a) and (d) and 2. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

4. This affidavit is based upon my training and experience, my personal knowledge and information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon police reports, surveillance videos, physical surveillance, and witness statements that I consider to be reliable as set forth herein.

5. Because this affidavit is submitted for the limited purpose of a obtaining a search warrant, I have not included each and every fact known to me concerning this investigation.

**II. PROBABLE CAUSE**

6. Law enforcement is currently investigating three armed bank robberies in southeastern Wisconsin between April 8, 2019, and August 9, 2019. Evidence reflects that Justin Smith served as the armed robber and William Balgie as the getaway driver in each of the bank robberies.

7. On April 8, 2019, at approximately 11:07 a.m., a white male subject entered the National Exchange Bank & Trust, a federally insured financial institution, located at 6278

2

Blueberry Road, in Allenton, WI, an unincorporated community within the Town of Addison, in Washington County, Wisconsin. The subject had a cell phone to his ear most of the time he was in the bank, and the victim teller heard him say into his cell phone, "I'm here now," as he approached the teller counter. The subject threw a blue bank-style bag onto the counter and said something, which the teller did not understand. The subject then motioned downward toward the bank bag, which had writing on it saying only 50's and 100's. The subject then raised a silver and black handgun above the countertop toward the teller. The teller retrieved money from her drawer gave it to the subject who fled the bank in a southbound direction. Bank surveillance cameras captured the robbery. The subject was described as a white male in his early to mid-20's, possibly 5'05" to 5'08" tall, slender build, with facial hair, wearing dark clothing with a dark-colored knit cap and glasses.

8. A witness who lived about a half a block from the bank reported that she observed an older maroon Chevy Tahoe-type SUV parked outside of her home on Blueberry Road, close to the bank. She was suspicious of the vehicle because of where it was parked and thought the occupants were casing houses to commit a burglary. She watched the vehicle for approximately 10 minutes. She saw the driver waiting in the vehicle with the window down. Then, a second subject wearing a dark winter hat entered the passenger side of the SUV. The driver then drove off at a high rate of speed south on Blueberry Road. Another witness, who was working in a farm field about 1.1 miles from the bank, reported that he saw a late 1990's red Ford Explorer stopped at the stop sign for an extended period of time. He was later asked if the car could have been a Mercury Mountaineer and reported that late 1990's Ford Explorers and Mountaineers are very similar, so it could have been.

3

9. At 11:22 a.m. (14 minutes after the initial robbery call came in), a Washington County Sheriff's Deputy ran the plate (914DYD) of a red 1998 Mercury Mountaineer SUV as the SUV traveled southbound on US 41 at a crossover between Hwy 60 and Hwy 144. This location would be one of only a couple of ways to access US 41 to Milwaukee from the direction the subject vehicle fled from the bank.

10. On June 17, 2019, at approximately 3:39 p.m., Menomonee Falls Police responded to a robbery at the Cornerstone Community Bank, a federally insured financial institution located at N91 W17231 Appleton Avenue in Menomonee Falls, WI. Victim tellers reported that a white man walked into the bank while talking on a cell phone. Just before approaching a teller window, the subject said, "I'll call you back." The subject held a piece of paper in his left hand, which the teller believed was a check he was going to cash. Instead the subject stated, "I need your 100's and 50's" and then pulled up his jacket on his left side and displayed a silver and black handgun. The victim teller asked for the subject's account number in an attempt to delay him and he then stated, "I need all your 100's and 50's and this is for real," while again showing her the handgun. The victim teller handed over a quantity of cash from the teller drawer and he fled the bank. The subject was last observed running north/west in the parking lot toward St. Francis Drive.

11. A witness outside the bank reported that she saw the suspect running from the area of the bank to an awaiting red or maroon Dodge Durango-type SUV that was already running with someone in the driver's seat. The SUV then left the area.

12. Surveillance footage from a nearby business, Smart Cow, showed footage of a maroon SUV pulling into the west side of the business off of St. Francis Drive and parking at the north end of the lot. A passenger (the subject) is then observed exiting the vehicle and walking on foot toward the Cornerstone Bank. Approximately two minutes later the subject is observed

4

running from the area of Cornerstone Bank and entering the SUV, at which time the maroon SUV exited to St. Francis Drive then went east on Appleton Ave.

13. Interior and exterior surveillance cameras from the Cornerstone Bank captured the activity described above. The subject was wearing a black zipper in front jacket, gray/light blue jeans, gray shoes and a black and gray baseball cap with a "C" or similar shape in the front portion. The subject was a white male, approximately 25-35 years old, wearing glasses and had a slight beard and mustache with a thin build. At 3:41 p.m., after the robbery, the exterior footage captured a maroon SUV with a push bar on the front, driving eastbound on Appleton Ave. This vehicle appeared to be the same vehicle that was captured on the Smart Cow surveillance footage.

14. A Beaver Dam Police Officer police officer contacted a Menomonee Falls detective and advised that the subject looked similar to Justin Smith who had been investigated in an attempted bank robbery in 2017. The 2017 investigation indicated Smith had a drug addiction. Detectives determined Smith appeared to be the subject after comparing Smith's booking photograph to the Cornerstone Community Bank surveillance images. As discussed below, Smith has admitted his involvement in this robbery. Balgie admitted he was present but maintains that he thought Smith was passing bad checks, not committing bank robberies.

15. Smith's last known address was in Waupun, WI. On July 11, 2019, Detectives from the Washington County Sheriff's Office went to Waupun in an attempt to locate and surveil Smith. In Waupun, they observed a maroon Mercury Mountaineer with a push bar on the front bumper, similar to the one observed at the Cornerstone Bank robbery, bearing Wisconsin registration license plate 914-DYD. The Mercury Mountaineer lists to Fredric and Nancy Balgie of Waupun. Detectives checked the plate 914-DYD in the Washington County data base and found

5

Case 2:19-mj-01321-WED    Filed 10/01/19    Page 6 of 17    Document 1

that it had been run by a Washington County Sheriff Deputy on April 8, 2019 at 11:22 a.m. on US 41 southbound after the Allenton National Exchange Bank robbery.

16. On July 6, 2019, William Balgie was traffic-stopped for speeding driving the Mercury Mountaineer bearing plates 914DYD in Fond du Lac County.

17. On July 23, 2019, a Washington County Sheriff's Office observed the maroon Mercury, at a Sai Mart gas station on Hwy 33 in Allenton. Surveillance video from the Sai Mart showed that the passenger in the vehicle was Smith and that it was being driven by the listed owner's son, William D. Balgie (DOB XX/XX/1984).

18. On July 30, 2019, an investigator made contact with Karavan Trailer in Fox Lake, WI, and learned that both Balgie and Smith had recently worked there. Balgie worked there from 4/16/2019 to 5/27/2019. Smith had worked there from 4/16/2019 to 7/9/2019. Records showed that Smith did not work on June 17, 2019, the day of the Cornerstone Bank robbery, as he called in stating that he had child care issues.

19. On August 5, 2019, an officer with the Waupun Police Department conducted a traffic stop on the Mercury Mountaineer. William Balgie was the driver and Justin Smith was the passenger. At that time, Smith stated that he resided at 8 ½ S. Mill Street in the City of Waupun, which was where the traffic stop occurred. Smith stated that Balgie had just picked him up to go swimming. In addition, on August 6, 2019, a Washington County Detective observed Smith get picked up at the address of 8 ½ S. Mill St. by Balgie in the Mercury Mountaineer.

20. On August 8, 2019, at 10:46 a.m., an officer with the Waupun Police Department conducted a traffic stop on the same Mercury Mountaineer for the driver's and passenger's failure to wear seat belts. Balgie was again the driver and Smith was the passenger. Smith again said that Balgie had just picked him up for them to go swimming at Balgie's house. Smith provided

6

telephone number 920-579-8754 to the officer; Balgie provided telephone number 920-583-0125 to the officer. Smith also discussed that he had taken some days off of work at Karavan Trailer because it was his birthday the next day, August 9.

21. On August 9, 2019, at approximately 12:00 p.m., a white male subject entered the National Exchange Bank, a federally insured financial institution, in Glenbeulah, Sheboygan County, WI. The subject had a small blue zipper bag in his hand as he entered the bank. The subject placed the bag on the counter and stated something to the effect of, "I have some Yen to exchange." The victim teller was unclear as to what he wanted. The subject then displayed a handgun and placed it on the counter with the barrel pointed toward the teller. She described the gun as being silver and black. The teller activated the alarm. The subject demanded money, in denominations of 100's, 50', and 20's. At some point, the subject stated, "…you better hurry up. Give me the large bills." The subject obtained cash from the teller, which had been placed into in the blue bank bag. Based upon witnesses' descriptions and surveillance footage, the subject was described as a white male, approximately 5'9", wearing a camouflage colored hat, safety glasses, dark gray t-shirt, dark pants, and work boots. The victim teller described the subject as shaking or having tremors throughout the robbery.

22. Smith's face is visible in the bank robbery footage and investigators who compared the Glenbeulah robbery footage to the footage in the earlier two robberies believed it to be the same subject. Exterior footage also captured what appeared to be a red Mountaineer SUV with damage to the right rear window and a push bar on the front bumper as it passed the bank before and after the robbery. At 11:44 a.m., just before the robbery, the same car was captured on footage as it drove past a convenience store in Glenbeulah, in close proximity to the victim bank.

7

23. Officers later learned that a Plymouth Police officer had queried Balgie's red Mountaineer license plate 914-DYD as it was traveling on Highland Avenue in Plymouth prior to the robbery. Plymouth is approximately a 10-minute drive south east from Glenbeulah and would be one of the shorter routes to Milwaukee from Glenbeulah.

24. Automated license plate readers in Milwaukee recorded the license plate for the Mercury Mountaineer near 35th and Grant in Milwaukee, at 12:58 p.m. After the robbery, Sheboygan County officers initiated an exigent circumstances ping on Smith's phone number 920-579-8754. Those records showed the phone traveling toward Milwaukee after the robbery.

25. At approximately 2:13 p.m., Washington County officers who were searching for the red Mountaineer stopped the Mountaineer on the exit ramp to State Highway 60 from northbound I-41. Balgie was the driver and Smith the passenger – they were both arrested.

26. From Smith's shoe, officers recovered $892. In addition, officers recovered the following drugs from Smith: three bindles containing a total of 1.1 grams of cocaine base with packaging, a contact case containing 0.2 grams of cocaine base, and after a strip search at the time of his booking, officers recovered approximately 1.5 grams (with packaging) of crack cocaine from between Smith's buttocks.

27. From Balgie, officers recovered a contact case with one side containing 1.8 grams of fentanyl and the other side containing 0.2 grams of cocaine base.

28. Officers searched the Mercury Mountaineer pursuant to a state search warrant and recovered documents in Smith's and Balgie's names, drug paraphernalia including a cocaine pipe, razor blades, and pen with drug residue, a zip-up blue bank bag containing foreign currency consistent with the bag the robber carried during the Allenton and Glenbeulah bank robberies, a holstered replica handgun with a silver slide and olive-drab finish, a camouflage hat consistent

8

with the one worn during the Glenbeulah bank robbery, and safety glasses consistent with those worn by Smith in the Glenbeulah bank robbery. From the center console, officers recovered a gray LG cell phone with a black textured case. From the front passenger area, officers recovered a black LG G7 Thin Q cell phone with a black/gray case and the charging cable attached. Smith later consented to a search of his phone, the Thin Q cell phone. Receipts from the Walgreens located at 6707 West Hampton dated 8/9/2019, at 1:48 p.m. and 1:49 p.m. This Walgreens is about an hour from the Glenbeulah bank (robbery at 12:00 p.m.). Surveillance video from the Walgreens showed the red Mountaineer with Balgie as the driver and Smith as the passenger. Balgie and Smith exited the Mountaineer and entered the Walgreens and made the purchases which corresponded to the receipts.

29. From a large tote bin in the Mountaineer's rear storage area, officers recovered a black and silver replica handgun, which appeared consistent with the one brandished during the Glenbeulah robbery, black pants and brown shoes (consistent with the clothing Smith wore during the Glenbeulah robbery.

30. On August 9, 2019, investigators attempted to interview Smith. Before he could be read his Miranda rights, he said that the wanted to exercise his rights. He said that he wasn't in a mood to talk. When asked if he might want to talk tomorrow morning, he said, "probably yeah."

31. Smith was then interviewed on August 12, 2019, August 14, 2019, and August 16, 2019. During those interviews, Smith admitted to his involvement in all three robberies. He admitted that he was a regular drug user. Smith displayed his black and silver replica handgun during the robberies. He stated that for each of the robberies he was with William Balgie, and Balgie was driving the red Mountaineer. He explained that they needed money to buy drugs. After each robbery, Smith got into the back seat of Balgie's Mercury Mountaineer and hid in the

9

large tote bin in the back of the SUV. Balgie then drove away. He left the handgun and other items he used in the August 9, 2019 robbery in the tote bin and in the car. During the last robbery, he admitted that he obtained about $1400 and he and Smith drove to Milwaukee, where they purchased a half ball (1/16 ounce) of crack cocaine and 3.5 grams of heroin. Smith split the ½ ounce of crack cocaine with Balgie.

32. Smith stated that Balgie had full knowledge that Smith planned to commit a robbery. They discussed their plans ahead of time. Balgie kept the motor running and planned a getaway route before the robberies. Smith did not carry the handgun on him, but rather had to retrieve it before each of the robberies, which Balgie would have observed.

33. Smith said that he owns a cache of weapons and high capacity magazines and provided details regarding the firearms. He said he likes to shoot, not harm, people. Smith said he and Balgie were planning a "big score." They talked about how they would bring assault weapons with "drums" (high capacity magazines) if they were to get boxed in by police. They would shoot the engine block of the police "cruiser." Smith said he doubted that they would have actually committed the "big score" robbery, but they talked about.

34. Smith also admitted to hiding the drugs in his buttocks while in the back of a squad car. He explained that while handcuffed, he retrieved a compact case from his shoe, open up one side of the case, retrieved the drugs, put them in his butt, and put the contact case back in his shoe. At some point, the top of the contact case fell off and he kicked it under the officer's seat. (The top of the contact case was later recovered from the transporting squad car.) Smith stated that the drugs he put in his buttocks should amount to 1.6 grams of fentanyl.

35. Smith admitted that in addition to being a heavy drug user, he sells drugs to several people. He said that he gets good deals on drugs.

36. Smith consented to a search of his phone. A preliminary review of the download showed google searches from the phone on August 9, 2019, for several banks and locations of significance, including "Glenbeulah Police Department," "Exchange Bank Grafton WI," "Grafton Police," "US Bank Grafton," "Bank Lamartine WI," and "Bank Grafton WI." On August 8, 2019, there were searches for "Associated Bank of Dousman WI," and "Court Police Radio."

37. On August 9, 2019, the date of his arrest, Balgie provided a statement to police. Balgie admitted that he was a drug user. He stated that he has known Smith for 4-5 months and they have worked together at several different places. He also admitted that he is the primary user of the Mercury Mountaineer. He said that prior to their arrest, he and Smith were in Milwaukee buying heroin and crack cocaine. He admitted to driving Smith to all three banks, National Exchange Bank in Allenton, Cornerstone Bank in Menomonee Falls, and National Exchange Bank in Glenbeulah. However, he stated he thought Smith was cashing forged/bad checks. He denied knowing that Smith was committing robberies at each of these locations. He also claimed that he never received any money or drugs from Smith, but he purchased all of the drugs with money he received from his father. Balgie requested counsel after investigators gave him specifics about each of the bank robberies.

38. I previously obtained a search warrant for cell site records from Verizon for telephone number 920-583-0125, which Smith had provided to law enforcement. However, those records only reflected cell site data for August 2019, not the preceding months. Menomonee Falls Police Department records reflect that Smith previously used telephone number 920-382-0457. In addition, law enforcement databases show this telephone number associated with Justin Smith.

39. I submit that there is probable cause to believe that the records identified in Attachment B, which correspond to telephone number 920-382-0457, are likely to constitute

11

evidence of the above described bank robberies on April 8, 2019, June 17, 2019, and August 9, 2019. According to law enforcement databases, US Cellular was the Provider for this telephone number during the time period at issue.

40. In my training and experience, I have learned that US Cellular is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

41. Based on my training and experience, I know that US Cellular can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as US Cellular typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

42. Based on my training and experience, I know that wireless providers such as US Cellular typically collect and retain information about their subscribers in their normal course of

12

Case 2:19-mj-01321-WED    Filed 10/01/19    Page 13 of 17    Document 1

business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as US Cellular typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users.

## AUTHORIZATION REQUEST

43. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

44. I further request that the Court direct US Cellular to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on US Cellular, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

13

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 920-382-0457, ("the Account"), that are stored at premises controlled by US Cellular ("the Provider"), headquartered at 8410 W. Bryn Mawr, in Chicago, Illinois, 60631.

14

# ATTACHMENT B

## Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time periods from April 1, 2019 through April 10, 2019; June 10, 2019 through June 19, 2019; and August 1, 2019 through August 10, 2019:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

15

Case 2:19-mj-01321-WED     Filed 10/01/19     Page 16 of 17     Document 1

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 2113(a) and (d) and (2), during the periods from April 1, 2019 through April 10, 2019; June 10, 2019 through June 19, 2019; and August 1, 2019 through August 10, 2019.